## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **WENDY JENSEN AYLWARD** and **MARY ROCERETO,** ) ) ) | |
| Plaintiffs, ) | Case No. 03 C 6097 |
| ) | |
| v. ) | Magistrate Judge |
| ) | Martin C. Ashman |
| **HYATT CORPORATION,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Defendant, Hyatt Corporation (hereinafter "Hyatt"), moves the Court to grant summary judgment in its favor pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiffs, Wendy Jensen Aylward and Mary Rocereto, oppose summary judgment and move the Court to strike certain affidavits on which Hyatt relies in its motion for summary judgment, alleging that the contents of the affidavits do not comply with the requirements of Rule 56(e) of the Federal Rules of Civil Procedure. The parties have consented to have this Court conduct any and all proceedings in this case, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(a). For the reasons that follow, Plaintiffs' motion to strike is granted in part and denied in part, and Hyatt's motion for summary judgment is granted.

### I.    Factual Background

Plaintiffs, Wendy Jensen Aylward and Mary Rocereto, were employees of Hyatt's National Sales Force (hereinafter "NSF"), which sells Hyatt's hospitality services to large

companies and organizations that use Hyatt's services in multiple cities around the country. (Def.'s LR56.1 ¶ 3.) As national sales managers, Aylward and Rocereto established and maintained long-term relationships with a group of national customers whose accounts they developed and serviced. (Pls.' LR56.1 ¶ 1.) Both Plaintiffs were terminated by Hyatt effective October 1, 2001, as part of a Reduction in Force (hereinafter "RIF") in the NSF. (Pls.' LR56.1 ¶¶ 21, 40.) Plaintiffs allege that their termination was the result of unlawful discrimination based on gender, age, and disability. Their respective employment histories and the circumstances surrounding their termination are set out in greater detail below.

### A.    Rocereto's Employment History

Rocereto began working for Hyatt in 1978 and became a member of Hyatt's NSF in 1993. (Def.'s LR56.1 ¶¶ 5, 7.) When she joined the NSF, Rocereto's title was Director of Insurance Industry Sales and she was responsible for insurance industry accounts in the Midwest and Canada. (Def.'s LR56.1 ¶ 7.) In late 1994 or early 1995, Rocereto was made the head of Hyatt's Florida National Sales Office and given the title Director of National Accounts and Insurance Industry Sales. (Def.'s LR56.1 ¶ 8.) Rocereto did not meet her sales goals for 1995 and 1996 so John Hyland, her manager at the time, gave her a performance rating of "improvement needed" in 1996. (Def.'s LR56.1 ¶ 10.) From 1997 until the time of her termination in 2001, however, Rocereto met her sales goals and received favorable performance reviews from her manager, Hyland. (Def.'s LR56.1 ¶ 11.) Beginning in 2000, Rocereto worked out of her home near Tampa Bay, Florida, though most of her accounts were not located in the Tampa Bay area. (Def.'s LR56.1 ¶¶ 12, 38.) On March 21, 2001, Rocereto applied for family medical leave in connection

- 2 -

with the impending birth of her child. (Def.'s LR56.1 ¶ 13.) Rocereto was granted such leave without incident and with full pay commencing July 2, 2001 through August 12, 2001.[1] (Id.) By the time of the RIF in the Fall of 2001, Hyatt's insurance industry accounts in general were declining and Rocereto's largest account was "booked out," meaning that it lacked growth potential. (Def.'s LR56.1 ¶ 38.) In the Fall 2001 RIF, Rocereto was selected for termination.

## B.    Aylward's Employment History

Aylward began working for Hyatt in 1988 and became a member of Hyatt's NSF in 1993. (Def.'s LR56.1 ¶¶ 15, 16.) As a member of the NSF, Aylward was based in Greenwich, Connecticut. (Def.'s LR56.1 ¶ 16.) In February 1995, Aylward was promoted to Director, National Accounts for the NSF, a position she held until her termination in 2001. (Id.) For approximately five years, until the summer of 2001, Aylward's direct supervisor was Linda Wilcox. (Def.'s LR56.1 ¶ 17.) Aylward received performance reviews of "meets expectations" or better throughout her tenure at Hyatt. (Def.'s LR56.1 ¶ 22.) By the time of the 2001 RIF, however, Aylward had the lowest performing group of accounts of any member of the NSF. (Def.'s LR56.1 ¶ 43.)

In March 1999, Aylward was diagnosed with multiple sclerosis (hereinafter "MS") after being hospitalized for a seizure. (Def.'s LR56.1 ¶ 18; Pls.' LR56.1 ¶ 24.) Aylward's MS caused her to suffer several long-term impairments, such as cognitive impairments affecting her short-term memory and concentration, fatigue, and low tolerance for heat. (Pls.' LR56.1 ¶ 25.)

---

[1] Rocereto claims that she was granted leave without incident and with full pay commencing June 21, 2001. (Pls.' Resp. Def.'s LR56.1 ¶ 13.) Rocereto claims that she returned to work, still on part-time maternity leave, on August 10, 2001. (Id.)

Shortly after she returned home from her hospitalization, Aylward informed her immediate supervisor Linda Wilcox of her disease and requested several accommodations designed to help her perform her job, including more frequent breaks, reduced travel, and allowing her incoming telephone calls to go to voice mail so that she could answer them all at the end of the day. (Def.'s LR56.1 ¶ 19.) Hyatt granted all of these requests for accommodation. (Def.'s LR56.1 ¶ 20.)

In March 2001, Wilcox prepared Aylward's 2001 annual performance review. Wilcox gave Aylward an overall rating of "meets expectations" but suggested, among other things, that Aylward increase her travel and entertaining, enroll in a computer class, and work to improve her performance in the areas of task management and organizational skills. (Def.'s LR56.1 ¶ 23; Pls.' LR56.1 ¶ 30.) Aylward agreed with the strengths and weaknesses identified by Wilcox, (Def.'s LR56.1 ¶ 26), and acknowledged that criticism of her task management and organizational skills was fair and reasonable. (Def.'s LR56.1 ¶ 23.) Nonetheless, Aylward objected to this performance review, specifically arguing that the review should have explicitly mentioned her MS. (Def.'s LR56.1 ¶ 24.) In response to Aylward's request, Wilcox consulted with Assistant Vice President of Sales John Horne,[2] who then consulted with the Human Resources Department. (Def.'s LR56.1 ¶ 25.) Ultimately, Wilcox did not add a MS reference to Aylward's review but, in April 2001, asked Aylward to provide a written note from her doctor regarding her diagnosis and the limitations imposed by her MS.[3] (Def.'s LR56.1 ¶ 27.) Wilcox also told Aylward that Hyatt would continue to adjust Aylward's work schedule based on her health situation. (Def.'s LR56.1

---

[2] At all relevant times, John Horne was Hyatt's Assistant Vice President of Sales.

[3] Hyatt did not receive a letter from Aylward's physician until September 19, 2001, (Def.'s LR56.1 ¶ 47), by which time, Hyatt contends, Aylward was already designated for termination.

- 4 -

¶¶ 27, 28.) As these facts suggest, and as Aylward has stated in deposition testimony, Hyatt never removed or denied a requested accommodation.[4] (Def.'s LR56.1 ¶ 28.)


### C.    The Fall 2001 RIF

After the terrorist attacks of September 11, 2001, Hyatt experienced a severe and immediate downturn in its business.[5] (Def.'s LR56.1 ¶ 31.) Acting on the orders of Hyatt's President, Senior Vice President of Sales Tyson Helms instructed John Horne to examine his business operations for cost savings opportunities, including personnel reduction. (Def.'s LR56.1 ¶ 32.) As Hyatt's Assistant Vice President of Sales, Horne's responsibilities included managing and supervising the NSF. (Horne Aff. ¶ 1.)

Horne examined the NSF for cost saving opportunities. (Def.'s LR56.1 ¶ 34.) Horne testified that he evaluated the NSF personnel based on the characteristics of their accounts, such as the value of the accounts, their geographical location, and the possibility of servicing the accounts from another location or with another salesperson. (Id.) This was a departure from Hyatt's normal RIF selection procedure, which traditionally gives significant weight to seniority, among other factors. (Pls.' LR56.1 ¶ 16.) After completing his evaluation, Horne grouped employees into categories labeled "A," "B," and "C," with the "A" and "B" categories

---

[4] Aylward interpreted certain of Hyatt's suggestions for improvement as in effect removing her accommodations, (Pls.' LR56.1 ¶ 31), but no action was taken to actually remove any of Aylward's accommodations. (Def.'s LR56.1 ¶ 28.)

[5] Plaintiffs do not dispute that the attacks had a significant negative impact on Hyatt's business. (Def.'s LR56.1 ¶ 31.)

representing employees considered more or less essential to the NSF and the "C" category representing employees selected for termination. (Def.'s LR56.1 ¶ 34.)

According to Horne, Rocereto was selected for termination because the insurance and financial industry accounts in which she specialized were declining and could be handled by a single manager. (Def.'s LR56.1 ¶ 38.) In addition, Horne claims to have selected Rocereto because her largest account, "Timco," was "booked out," meaning it lacked potential for growth, and because she was not geographically located near her accounts. (Id.) While Rocereto was let go, the other NSF member specializing in insurance accounts, Marilyn Brumbaugh, was retained in the RIF. (Id.) At the time of the RIF, Rocereto was forty-four years old and Brumbaugh was fifty-six years old. (Id.)

Aylward was also selected for termination in the Fall 2001 RIF. Horne testified that she was selected for elimination because she had the lowest performing group of accounts of any member of the NSF. (Def.'s LR56.1 ¶ 43.) He further testified that he did not review Aylward's performance reviews when selecting her for termination. (Id.)

### D. Charges of Discrimination

Plaintiffs filed timely discrimination charges with the U.S. Equal Employment Opportunity Commission. (Pls.' Compl. at 8.) Rocereto alleged that she had been discriminated against by Hyatt on the basis of her gender and her age. Aylward alleged that she had been discriminated against on the basis of her gender and her disability. Both Plaintiffs received a notice from the EEOC of their right to sue in federal court and subsequently filed the instant lawsuit on August 29, 2003, in the United States District Court for the Northern District of

Illinois. (Id.) On March 30, 2005, Hyatt moved for summary judgment on all charges. Plaintiffs filed a brief opposing summary judgment, and on May 13, 2005, moved to strike the affidavits of John Horne, Tyson Helms, and Douglas Patrick, on which Hyatt relies in moving for summary judgment.

## II. Discussion

### A. Plaintiffs' Motion to Strike

Plaintiffs move the Court to strike the affidavit testimony of John Horne, Tyson Helms, and Douglas Patrick, on which Hyatt relies in moving for summary judgment. Plaintiffs allege that the affidavits may not be considered when ruling on Hyatt's motion for summary judgment because they do not comply with the requirements of Federal Rule of Civil Procedure 56(e). Specifically, Plaintiffs claim that statements contained in the affidavits are (1) not based on personal knowledge, (2) not supported by authenticating records, (3) inadmissible hearsay, and (4) inconsistent with the affiants' previous sworn testimony. (Pls.' Mot. to Strike at 1.)

Rule 56, which governs motions for summary judgment, provides that affidavits supporting a motion for summary judgment must be based on personal knowledge and must set forth a basis for the affiant's knowledge of the information in the affidavit. Fed. R. Civ. P. 56(e). When ruling on a motion for summary judgment, the Court may not rely on affidavits that do not conform to these rules. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 359 (7th Cir. 1998). This Court has the discretion to strike all of an affidavit or only those portions which do not comply with Rule 56(e). *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 505 (7th Cir. 2004).

1.    Affidavit of John Horne

Plaintiffs argue that paragraphs 3, 7, 8, 15, 16, 19, and 23 of Horne's affidavit

should be stricken because the information contained therein is not within Horne's personal

knowledge and is unsupported by authenticating documentation. In addition to their specific

objections to paragraphs 3, 7, 8, 15, 16, 19, and 23, Plaintiffs also argue generally that Horne's

testimony does not provide a basis for his knowledge of the information contained in his

affidavit.

The challenged paragraphs in Horne's affidavit state:

3.    The NSF is responsible for approximately 40% of Hyatt's annual
business.

7.    In May 2001, I implemented cuts in travel and
entertainment-related expenses for NSF offices, which resulted in a
savings of approximately $350,000.

8.    The terrorist attacks of September 11, 2001 greatly exacerbated the
downturn in the hospitality and other industries. Immediately
following September 11, 2001, I further reduced the NSF budget
by canceling certain NSF customer events, such as the Tournament
of Champions and Wine Weekend. These reductions resulted in an
additional savings of $150,000.

15.   In making the decision to eliminate Ms. Rocereto's position, I did
not consult with her manager, John Hyland, and I did not examine
her performance reviews. Instead, as with all the other NSF
positions under consideration, my decision to eliminate
Ms. Rocereto's position was based on the characteristics of her
account base and Hyatt's ability to service such accounts at other
locations. In addition, I did not consider Ms. Rocereto's maternity
leave when making the decision to eliminate her position. Many
NSF employees have taken maternity leave and have returned to
their positions without incident, including, for example,
Denise Cmiel, Jennifer Roman, Michelle Relecker, Bonnie
Greenspan, Michelle Russell, Kathy Murphy and Lorraine
McCormack.

- 8 -

16. After the elimination of Ms. Rocereto's position in the reduction in force, 26 of her 34 accounts were reassigned to Marilyn Brumbaugh, who was 56 years old at the time of the reduction in force. Of Ms. Rocereto's remaining accounts, all but three were assigned to other females in the NSF, and only four were assigned to individuals who were 10 or more years younger than Ms. Rocereto. One of those younger individuals, Jennifer Roman, received the Timco account. As I stated above, the Timco account was already fully "booked out" and lacked growth potential. Ms. Roman received no credit for the existing Timco bookings when she inherited the account. Ultimately, five of Rocereto's accounts were released to the field because they failed to meet the criteria for a national account. Ms. Roman operated out of Atlanta, where many of her customers were located, and had a greater diversity of business than Rocereto, some of which Roman brought with her from her former company.

19. On or about October 1, I met with Ms. Aylward to inform her that her position had been eliminated. Ms. Aylward's accounts were distributed among seven existing NSF employees, of whom five were female. Although a majority of Ms. Aylward's accounts were initially distributed to Jim Van Devender, several of those accounts were later released to the field because they did not qualify as national accounts.

23. On June 8, 2001, Ms. Wilcox went on unpaid leave, and thereafter voluntarily resigned her employment with Hyatt. From June 2001 until the termination of Ms. Aylward's employment in the fall 2001 reduction in force, I served as her de facto manager. At no point during that time period did Ms. Aylward contact me to complain about a lack of accommodations for her condition, or to complain about mistreatment of any kind.

(Horne Aff. ¶¶ 3, 7, 8, 15, 16, 19, 23.)

The Court finds that Horne's affidavit does provide a basis for his knowledge of the facts contained in much of this testimony. The affidavit states that Horne was Assistant Vice President of Sales until May 2002, at which time he was promoted to Vice President of Sales. (Horne Aff. ¶ 1.) As Assistant Vice President of Sales, Horne managed the NSF, oversaw the

personnel of the NSF, and was familiar with the account characteristics of his employees. (Horne Aff. ¶ 5.) He was also personally involved with selection of employees for the Fall 2001 RIF. (Horne Aff. ¶¶ 10-13.) Therefore, there is a basis in the affidavit for Horne's knowledge of the matters on which he testifies.

An affiant who acts in a management capacity in a corporation will often become aware of the finances, organization and employees of the corporation. *See, e.g., Boim v. Quranic Literacy Inst.*, 340 F. Supp. 2d 885, 925 (N.D. Ill. 2004). As Assistant Vice President of Sales, Horne managed and supervised the sales force and had personal knowledge of Hyatt's overall financial situation, Hyatt's organizational decisions, and the personnel and account characteristics of the employees whom he was charged with managing. Therefore, Horne's testimony regarding the financial condition of the corporation, corporate-level organizational decisions, the characteristics of employee account bases and the specific details of and motivations for the Fall 2001 RIF does not violate Rule 56(e). This testimony will not be stricken and will be considered in ruling on Hyatt's motion to dismiss.

To the extent that Horne's affidavit references specific numbers and figures, as opposed to more general information that he would be familiar with in the course of his employment, the affidavit may not be based on his personal knowledge. For instance, while Horne would know in the course of his employment that the NSF was responsible for a major portion of Hyatt's annual sales, it is not clear that the precise figure of forty percent provided in paragraph 3 of his affidavit is similarly within his personal knowledge. The same can be said for Horne's specific claims in paragraphs 7 and 8. These figures appear to be based on reports and other financial records and require substantiating documentation. Therefore, the Court strikes the specific numbers which

- 10 -

Horne provides in paragraphs 3 (NSF accounts for forty percent of Hyatt's business), 7 (savings of $350,000), and 8 (savings of $150,000) of his affidavit, but not his more general testimony in the remainder of paragraphs 3, 7, 8, 15, 16, 19, and 23.

Plaintiffs also contend that Horne's testimony on the criteria used in selecting Aylward for termination in paragraph 17 of the affidavit should be stricken because it contradicts his deposition testimony. The Court disagrees with Plaintiffs' characterization of the testimony in paragraph 17. In his deposition, Horne stated that he (1) told Aylward that "Hyatt no longer needed an office at her address," (Horne Dep. at 48), and (2) planned to put most of Aylward's accounts with two other Hyatt employees. (Horne Dep. at 49.) In paragraph 17 of his affidavit, Horne states that Aylward's position was eliminated because "she had the lowest performing group of accounts of anyone in the NSF, and because many of her accounts were not truly national." (Horne Aff. ¶ 17.) There is no contradiction here: one piece of testimony refers to the explanation given to Aylward while the other refers to the selection process itself. Furthermore, the two explanations are not logically inconsistent, *i.e.*, it is possible that Hyatt no longer needed an office at Aylward's address because she had the lowest performing group of accounts. Because there is no contradiction, there is no reason to strike paragraph 17 or Horne's affidavit testimony on the criteria used to evaluate employees for the RIF or his basis for selecting Aylward.

## 2. Affidavit of Tyson Helms

Plaintiffs argue that the affidavit of Tyson Helms should be stricken because the information in paragraphs 6 and 8 of the affidavit is not within Helms' personal knowledge. The challenged paragraphs of Helms' affidavit state:

6. In the middle portion of 2001, certain cuts were made in non-personnel-related expenditures for the NSF resulting in a savings of approximately $350,000.00.

8. In the first few days after September 11, Hyatt hotels lost over $44,000,000.00 in business from immediate cancellations. Overall, Hyatt's business in 2001 was down $415,000,000.00 from the previous year.

(Helms Aff. ¶¶ 6, 8.)

Helms' affidavit states that, at all relevant times, he was Hyatt's Vice President of Sales. (Helms Aff. ¶ 1.) As discussed above in reference to Horne's affidavit, Helms' position provides a foundation for personal knowledge of the corporation's financial affairs. Therefore, Helms' general testimony about the corporation's financial situation and the negative impact of the September 11, 2001 terrorist attacks is based on personal knowledge, subject to the same distinction between general knowledge of the corporation's finances and precise financial figures discussed above in regard to Horne's testimony. Consequently, Plaintiffs' motion to strike Helms' affidavit testimony is granted only with respect to the numerical financial data on the dollar amount saved by the 2001 cost-cutting measures, specifically the "approximately $350,000.00" figure in paragraph 6 and the "$415,000,000.00" in losses set forth in paragraph 8. Aside from the two figures in paragraphs 6 and 8, nothing is stricken from Helms' affidavit.

- 12 -

3.    Affidavit of Douglas Patrick

Plaintiffs contend that the affidavit of Douglas Patrick should be stricken

because paragraphs 3, 17, 18, 19, 20 and 21 are not based on information within Patrick's

personal knowledge. The challenged paragraphs of Patrick's affidavit state:

3.    In my Human Resources capacity with Hyatt, I am also familiar
with Hyatt's corporate structure and organization. Hyatt is an
international corporation that is in the business of managing and
operating Hyatt hotel and resort properties throughout the United
States and the Caribbean. Hyatt employs over 35,000 individuals
in its various divisions, which include marketing, finance,
operations, human resources, legal and sales. Plaintiffs Wendy
Aylward and Mary Rocereto were employed in Hyatt's sales
division.

17.   In my Human Resources capacity with Hyatt, I have access to
certain demographic information about Hyatt employees, including
their ages and gender. Immediately prior to the late
September 2001 reduction-in-force, there were 77 sales positions
in the NSF. Of those 77 positions, nearly three-quarters (73%)
were occupied by females. Also, nearly 60% of the 77 positions
were occupied by individuals over the age of 40.

18.   The fall 2001 RIF resulted in the elimination of 10 sales positions
in the NSF. Of the 10 affected positions, 8 were held by females
and 2 were held by males. Likewise, 8 of the 10 affected positions
were held by individuals age 40 or older, with the remaining 2
positions held by individuals under the age of 40.

19.   Of the 77 individuals employed in the NSF prior to the
reduction-in-force, 9 were 50 years of age or older. Not one of the
individuals age 50 or older was terminated in the fall 2001
reduction-in-force.

20.   Upon the termination of their employment in the fall of 2001, both
Ms. Aylward and Ms. Rocereto were provided with 10 weeks of
severance pay as well as outplacement assistance.

21.   In my Human Resources capacity with Hyatt, I have access to the
hiring data for the NSF. During calendar years 2000 and 2001

> prior to the fall 2001 reduction-in-force, 27 individuals were hired
> or promoted into the NSF. Of those individuals, 13 were over the
> age of 40, and 18 were female.

(Patrick Aff. ¶¶ 3, 17-21.)

At all relevant times Patrick was Hyatt's Assistant Vice President of Human Resources. (Patrick Aff. ¶ 1.) This position provides a foundation for his personal knowledge of matters relating to the size and makeup of Hyatt's workforce. Patrick's testimony in paragraph 3 of his affidavit, that Hyatt employs "over 35,000 individuals," is general in nature and represents the type of personal knowledge associated with his position. However, the statistical demographic analysis of the NSF before and after the RIF contained in paragraphs 17 through 21 is not the type of general knowledge that a person in Patrick's position would have, and should have been supported by some form of authenticating documentation. Patrick states that he has "access to" the demographic information he provides. (Patrick Aff. ¶¶ 17, 21.) However, information culled from documents is not the same as information that is naturally within an affiant's personal knowledge.

Consequently, Plaintiffs' motion to strike is granted only with respect to the statistical information on the demographics of the National Sales Force provided by Patrick in paragraphs 17 through 21 of his affidavit. Because these paragraphs add no information without these statistics, paragraphs 17 through 21 are stricken in their entirety and the Court does not consider the testimony therein when ruling on Hyatt's motion for summary judgment.

### 4. Conclusion

For the reasons stated above, Plaintiffs' motion to strike is granted only with respect to: (1) the specific financial figures provided by Horne in paragraphs 3, 7 and 8 of his affidavit; (2) the specific financial figures provided by Helms in paragraphs 6 and 8 of his affidavit; and (3) paragraphs 17 through 21 of Patrick's affidavit testimony. The Court does not consider the stricken testimony when ruling on Hyatt's motion for summary judgment.

### B. Hyatt's Motion for Summary Judgment

Hyatt moves for summary judgment on all of Plaintiffs' claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party presents evidence showing that it is entitled to judgment as a matter of law, the party opposing summary judgment must demonstrate that there is a genuine dispute as to some material fact which remains to be resolved by a jury at trial. *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997).

In deciding a motion for summary judgment, a court must review the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 965 (7th Cir. 1998). The nonmovant may not rely upon mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

56(e). The nonmovant must show more than that there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, once the moving party has met its burden of production, the nonmovant can avoid summary judgment only by presenting evidence which shows that, in light of the applicable substantive law, "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

Although Plaintiffs have, in part (perhaps because of the Court's page limitations on briefs), lumped together various charges and counts, the Court analyzes each of Rocereto's and Aylward's charges separately.

### 1.     Plaintiffs' Title VII Gender Discrimination Claims[6]

Aylward and Rocereto allege gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (hereinafter "Title VII"). Title VII provides in relevant part that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex or national origin . . . ." 42 U.S.C. § 2000e-2 (2005). Under Title VII, there are two distinct methods by which a plaintiff can prove employment discrimination. Using

---

[6]  Although Plaintiffs' Third Amended Complaint alludes to Mary Rocereto's pregnancy and maternity leave, it does not affirmatively set forth a claim for pregnancy discrimination. Furthermore, the Third Amended Complaint states Rocereto and Aylward's claims of gender discrimination simultaneously and in the same language. Because only Rocereto was pregnant and on maternity leave, Plaintiffs' use of identical language convinces the Court that Rocereto does not state a claim for pregnancy discrimination. Ultimately, it is the duty of the parties and their counsel, and not the Court, to make clear on what grounds they seek to recover. *See* Fed. R. Civ. P. 8.

the "disparate impact" theory, a plaintiff can prove discrimination by identifying a facially neutral employment policy of the defendant and showing by statistical proof that this policy has a disproportionately harsh impact on members of a class protected under the statute. *See, e.g., Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430-32 (1971). This type of claim does not require proof of discriminatory intent. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003). The more common method for proving a discrimination claim is based on "disparate treatment" and alleges that the plaintiff was treated differently than one or more employees not in the protected class as a result of intentional discrimination by the defendant. *See Jackson v. Birmingham Bd. of Educ.*, 125 S. Ct. 1497, 1511 (2005); *Raytheon Co.*, 540 U.S. 52-53.

It is well established that a plaintiff alleging intentional discrimination under Title VII may prove her case either by a direct approach, producing evidence which leads directly to a conclusion that she was discriminated against by her employer, or by utilizing an indirect "burden-shifting" approach. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In a gender discrimination case, the indirect approach requires that the plaintiff present a *prima facie* case by showing that she is a member of the protected class, performed her job satisfactorily, and suffered an adverse employment decision. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). In addition, the plaintiff must show that at least one similarly situated employee not in the protected class was treated more favorably. *Id.* This *prima facie* case, if established, creates a presumption of discrimination and shifts the burden to the defendant to provide a legitimate nondiscriminatory reason for its employment decision. *Id.* at 978-79. If the defendant provides a legitimate nondiscriminatory reason for the adverse

- 17 -

employment action, any presumption of discrimination is erased, and the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason is a pretext intended to mask underlying intentional discrimination. *Id.* at 979. Unless the plaintiff can produce evidence showing that there is a genuine issue of material fact as to the issue of pretext, the defendant is entitled to summary judgment. *Id.* at 978.

### a.    The *prima facie* case

Both Plaintiffs claim gender discrimination, alleging that they were terminated by Hyatt because of their gender in violation of Title VII.

The Court treats Plaintiffs' claims as alleging intentional discrimination using the indirect, burden-shifting approach.[7] First, Plaintiffs' claims cannot be disparate impact claims because (1) they allege intentional discrimination rather than addressing a facially neutral employment policy and (2) Plaintiffs have not provided any statistical evidence that would support claims of disparate impact. Furthermore, there does not appear to be any evidence of intentional gender discrimination that would allow Plaintiffs to proceed under a direct method of proof. Consequently, the Court treats Plaintiffs' claims as based on intentional discrimination and proven by an indirect, burden-shifting approach. Thus, to establish a *prima facie* case, Plaintiffs must show that (1) they were members of the protected class of women, (2) they performed their

---

[7] Plaintiffs' memorandum opposing summary judgment argues that "[f]ormalistic methods of proof are not necessary." (Pls.' Br. at 7.) If Plaintiffs mean that there is no single, paradigmatic pattern of facts that are necessary to prove discrimination, to the exclusion of all other sets of facts, this is correct. Whatever types of proof Plaintiffs may rely on, however, Plaintiffs' evidence must be relevant to the elements of an established framework for proving discrimination.

jobs satisfactorily, (3) they suffered an adverse employment decision and (4) at least one similarly situated employee not in the protected class was treated better. Plaintiffs' claims of gender discrimination fail because they have not produced evidence of a similarly-situated male employee who was treated more favorably in Hyatt's RIF.

To be "similarly situated" for the purposes of establishing a *prima facie* case of employment discrimination, two employees must be "directly comparable in all material respects." *Sartor v. Spherion Corp.*, 388 F.3d 275, 279 (7th Cir. 2004). This requires more than a showing that two employees did the same job or had the same qualifications. Plaintiffs must show that there were no differentiating circumstances that would legitimately cause an employer to treat them differently. *Ineichen v. Ameritech*, 410 F.3d 956, 960-61 (7th Cir. 2005); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). In the case of salespeople like Aylward and Rocereto, whose jobs are to cultivate long-term relationships with a base of corporate clients, one salient characteristic that could lead to different treatment is the composition and profitability of their accounts. It is undisputed that Rocereto specialized in insurance clients and that the only other employee similarly situated in this respect was Marilyn Brumbaugh, a woman and therefore not outside the relevant protected class for a gender discrimination claim. (Def.'s LR56.1 ¶ 38.) It is also undisputed that Aylward had the lowest performing group of accounts (in terms of dollars) of any NSF member. (Def.'s LR56.1 ¶ 43.) Because of the relatively unique characteristics of their account bases, neither Rocereto nor Aylward have identified an employee outside the protected class of women who was "directly comparable in all material respects" and who was treated more favorably in the RIF.

- 19 -

Plaintiffs propose Jim Van Devender as a similarly-situated male employee who was treated more favorably. (Pls.' LR56.1 ¶ 49.) Van Devender worked for NSF in the same regional office as Aylward and, like Aylward, received some criticism in the areas of task management, meeting certain deadlines, filing expense reports, and profiling accounts on the computer. (Id.) Aylward concedes, however, that Van Devender had more lucrative accounts and received higher overall ratings than she did. (Pls.' LR56.1 ¶¶ 49-50.) In fact, the evidence shows that Van Devender's overall account production was more than double Aylward's in 2000. (Def.'s Resp. Pls.' LR56.1 ¶ 50.) Thus, from an accounts perspective, it does not appear that Van Devender was similarly situated to Aylward. There is also no dispute that Van Devender and Rocereto handled different types of accounts and worked out of different regional offices, suggesting that Van Devender was not similarly situated to Rocereto either.

The failure to identify similarly situated employees is fatal to both Plaintiffs' attempts to establish a *prima facie* case of gender discrimination under the indirect, burden-shifting approach.

### b.     Hyatt's nondiscriminatory reason

Even if Plaintiffs were able to establish a *prima facie* case under the indirect, burden-shifting approach, Hyatt has provided a legitimate nondiscriminatory reason for terminating Plaintiffs in the RIF. In his affidavit, John Horne, the employee directly responsible for terminating Plaintiffs, states that he selected them for termination as part of a company-wide strategy initiated in the aftermath of the September 11, 2001 attacks. Horne claims that he did not consult NSF performance evaluations when implementing the 2001 RIF, but made his

selections based on the characteristics of each salesperson's accounts, including composition, dollar value and geographical location. (Def.'s LR56.1 ¶ 34.) Horne's affidavit states that Aylward was selected for termination because many of her group accounts were not truly national and because her accounts had the lowest dollar value of any salesperson's, and that Rocereto was selected for termination because her insurance industry accounts were declining, could be handled by another manager specializing in insurance accounts, lacked growth potential, and were geographically distant from her. (Def.'s LR56.1 ¶¶ 38, 43.)

It is not disputed that Hyatt was in economic distress after September 11, 2001, and that it undertook cost-cutting measures. Nor is it disputed that Plaintiffs' accounts had the characteristics identified by Horne as the basis for selecting them for termination. Because Hyatt has produced a legitimate, nondiscriminatory explanation for its actions, it is entitled to summary judgment.

### c.     Plaintiffs' pretext argument

Plaintiffs claim to have sufficient evidence to convince a reasonable trier of fact that the explanation given by Hyatt is a pretext for underlying discrimination. In order to show that Hyatt's proffered nondiscriminatory reason is pretextual, Plaintiffs must directly rebut the proffered reason by showing that (1) Hyatt's explanation is unsupported by the facts, (2) Hyatt's proffered explanation is not the true reason for the decision, or (3) Hyatt's explanation was insufficient to warrant the adverse employment action. *See Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir. 1994). Plaintiffs argue that documents and testimony establish that Hyatt's true reason for firing them was to redistribute their accounts to other NSF members. (Pls.'

LR56.1 ¶ 44.) Plaintiffs find additional support for their theory in Hyatt's conspicuous failure to

adhere to it Business Process Review forms for RIFs, conflicting testimony from Hyatt's decision

makers regarding the origins of the "ABC" selection process they claim to have used during the

2001 RIF, NSF management's failure to provide Plaintiffs with valuable and diverse account

portfolios prior to the Fall 2001 RIF, and the fact that Hyatt's decision makers gave false

testimony in the past. For the reasons that follow, Plaintiffs' arguments fail.

Plaintiffs rely on several pieces of evidence to show that Hyatt fired them in order to

redistribute their accounts to other NSF members. The first piece of evidence, "Pls.' Ex. 38(j)," is

a Hyatt document used in selecting employees for the RIF that states that Rocereto's accounts

"would be" redistributed to Marilyn Brumbaugh. (Pls.' Ex. 38(j).) A second document, "Pls.' Ex.

38(g)," suggests that Diane Smith and Jim Van Devender may receive Aylward's group accounts.

(Pls.' Ex. 38(g).) Plaintiffs find the second document significant because Horne stated in his

deposition that he had a plan to redistribute most of Aylward's I.T. accounts to "Joanne and

Richard." These documents, however, do not undermine Hyatt's proffered explanation for firing

Plaintiffs. On the document labeled "Pls.' Ex. 38(j)," Rocereto's name appears in column "C,"

which listed employees to be terminated, while a contemporaneous document shows Marilyn

Brumbaugh's name in column "B," which listed employees to be retained. (Pls.' Ex. 38(g).)

Furthermore, "Pls.' Ex. 38(j)" states that Rocereto's accounts "would be" redistributed to

Brumbaugh, a statement apparently predicated on Rocereto's termination, not that Rocereto's

accounts "could be" redistributed as a reason for terminating her. Thus, it appears that Rocereto

had already been selected for termination by the time this document came into existence and the

fact that Hyatt planned to reassign her accounts after her termination does not undermine Hyatt's

proffered nondiscriminatory explanation. Next, on the document labeled "Pls.' Ex. 38(g)," Aylward is listed under column "C" and the accompanying text reads: "[Aylward] will lose I.T. accounts under the proposed I.T. restructure. Her group account production is the lowest in the office and can be redistributed between Diane Smith and Jim Van Devender." (Pls.' Ex. 38(g).) This is consistent with Horne's deposition testimony, where he states that he had a strategy for redistributing Aylward's I.T. accounts and comments on the fact that Aylward's group accounts were minimal. (Horne Dep. at 49.) Thus, Plaintiffs' evidence fails to establish an alternative reason for terminating them and does not undermine Hyatt's proffered explanation.

Plaintiffs' supporting evidence is not compelling either. Plaintiffs suggest that Hyatt ignored its normal Business Process Review for conducting a RIF and engaged in purely subjective firings in 2001. Specifically, Hyatt's normal RIF procedures traditionally require, among other things, an assessment of employees' evaluations and seniority. (Pls.' Ex. 144.) Such assessments did not occur in the Fall of 2001. Hyatt claims that, due to travel difficulties in the days following September 11, 2001, Hyatt's management was not able to complete the Business Process Review forms in a formal manner. Nonetheless, Hyatt insists that all relevant considerations were discussed and assessed orally. Whether or not Hyatt used its normal RIF procedure, however, does not create an inference of pretext. A showing of pretext requires more than simply showing that an employer did something odd, unusual or uncharacteristic. *See Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) (deviations from standard procedure do not create inference of pretext on their own: "the truly suspicious decision would be the one reached following perfect adherence to all formal rules."). Businesses must have the freedom to act in novel ways to respond to unique situations without raising an

- 23 -

inference of discrimination. Therefore, Plaintiffs' evidence that Hyatt did not follow standard company policy is not enough to support their pretext argument.

Next, minor inconsistencies in testimony do not undermine the credibility of Hyatt's proffered explanation. Plaintiffs highlight inconsistent testimony regarding the standards used when selecting Plaintiffs for termination and the exact meaning assigned to the "A," "B," and "C" categorization of employees on informal charts used in the selection process. Plaintiffs find it significant that decision makers gave differing testimony over who created the "ABC" charts and what exactly the different letters represented. The Court disagrees. The substance of the inconsistent testimony touches on relatively minor, technical details about the process by which employees were selected for termination. Inconsistent testimony about the exact meaning each manager remembers assigning to the "A," "B," and "C" categories and which Hyatt manager initially devised the "ABC" chart as a method for sorting the employees does not show that Hyatt's explanation of the criteria underlying that decision process is a pretext intended to mask discrimination.

Plaintiffs also attempt to highlight discrepancies in Hyatt's testimony to show that Hyatt's managers are not credible witnesses and their proffered reason for firing Plaintiffs is a lie. Plaintiffs claim that Hyatt's decision makers lied at an employment discrimination trial resulting from the 2001 RIF when they claimed that they had not been accused of discrimination in the past. Plaintiffs point out that, indeed, the decision makers were also being sued by Plaintiffs for discrimination. The allegedly inconsistent testimony of Hyatt's employees regarding whether they had ever been accused of discrimination fails to raise an inference of pretext because it does not have any relationship to the issue of whether Hyatt's reason for terminating Plaintiffs is

truthful. Plaintiffs may not rely on evidence impugning the credibility Hyatt's employees on an unrelated issue to satisfy their burden. Rather, to show pretext, Plaintiffs must directly address Hyatt's proffered reason and present evidence suggesting that the particular reason Hyatt provides is a pretext. *Compare to Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) (fact-finder could infer pretext from employer's inconsistent explanations *for the employment decision itself* where employer repeatedly cited poor performance as justification for firing employee but at trial claimed that performance played "zero role" in decision).

Finally, Plaintiffs claim that, even if Hyatt's proffered explanation is legitimate, Hyatt is responsible for deficiencies in the value or diversity of their account portfolios, as NSF's management is supposed to redistribute accounts and ensure that all NSF members have sufficient work. Plaintiffs therefore conclude that, by not providing them with better and more diverse accounts, Hyatt's management deliberately created a situation that would permit them to discriminate against Plaintiffs. With the exception of a few unsupported complaints about isolated accounts based in various cities around the United States, however, Plaintiffs provide no evidence regarding the history of account management and distribution within NSF. Rather, Plaintiffs ask the Court to simply assume that Hyatt engaged in discrimination by not preventing Aylward from holding the lowest performing group of accounts in the Fall of 2001 and by not sufficiently diversifying Rocereto's portfolio prior to the Fall of 2001. Plaintiffs offer a post hoc critique of the effectiveness of Hyatt's management but do not offer evidence of discrimination or even suspicious activities by Hyatt. This argument, which assumes that Hyatt began setting Plaintiffs up to fail months before the Fall 2001 RIF was implemented, fails for lack of supporting evidence.

Plaintiffs have not come forward with any evidence that would support the conclusion that Hyatt's explanation for their termination is a pretext intended to disguise intentional discrimination. Although Plaintiffs may subjectively disbelieve the proffered nondiscriminatory reason for their termination, without any evidentiary support tending to show that the proffered reason is a cover-up for underlying discrimination, there is no material basis for concluding that Hyatt's reason is a pretext for underlying gender discrimination.

Hyatt's undisputed facts show that Plaintiffs have not established a *prima facie* case of gender discrimination under the indirect, burden-shifting approach. In addition, Hyatt has given a legitimate, nondiscriminatory reason for its decision to terminate Plaintiffs, and Plaintiffs have not produced any evidence which creates an issue of material fact as to whether Hyatt's proffered reason is pretextual. Because Hyatt has met its burden of production and Plaintiffs have not met theirs, Hyatt is entitled to summary judgment on Plaintiffs' Title VII gender discrimination claims.

### 2. Plaintiff Rocereto's Age Discrimination Claim

Rocereto alleges that Hyatt discriminated against her based on her age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (hereinafter "ADEA"). The ADEA makes it unlawful for an employer to discharge any individual "because of such individual's age . . . ." 29 U.S.C. § 623(a)(1) (2005). Both "disparate treatment" and "disparate impact" claims, discussed above in the context of Title VII, are cognizable under the ADEA. *See Smith v. City of Jackson*, 125 S. Ct. 1536, 1543-44 (2005). Furthermore, the indirect burden-shifting approach to proving intentional discrimination, announced in the context of Title

VII in *McDonnell Douglas* and discussed in section II.B.1 above, is available to plaintiffs under the ADEA who assert a "disparate treatment" claim. *See Grimm v. Alro Steel Corp.*, 410 F.3d 383, 385 (7th Cir. 2005). As in the case of gender discrimination, the indirect burden-shifting approach requires the plaintiff to establish a *prima facie* case of age discrimination, which creates a presumption of discrimination that the defendant can rebut by proffering a legitimate, nondiscriminatory basis for its action. If the defendant provides a legitimate, nondiscriminatory reason for its action, the defendant is entitled to summary judgment unless the plaintiff meets its burden of producing evidence that creates a genuine issue as to whether the defendant's proffered explanation is a pretext to disguise intentional discrimination.

Rocereto advances several theories in her attempt to prove age discrimination. First, she presents statistical evidence on the makeup of the NSF before and after the RIF and argues that this proves age discrimination under the disparate impact theory. Second, she alleges there is circumstantial evidence of intentional discrimination which would allow her to prevail using the direct method of proof. Lastly, she argues that she can also prove discrimination using the indirect burden-shifting approach. For the reasons that follow, all of Rocereto's arguments fail, and Hyatt's motion for summary judgment is granted with respect to Rocereto's age discrimination claim.

### a. Disparate impact

Rocereto supports her claim of age discrimination with an apparently home-grown statistical analysis that shows the average age of the employees in Group A, who were retained, to be seven and one-half years less than the average age of the employees in Group C, who were

terminated. (Pls.' LR56.1 ¶ 13.) Rocereto also alleges that an "unusually high percentage" of employees over forty years of age was terminated in the RIF because fifty-six percent of the pre-RIF sales managers were age forty and over, while eighty percent of the terminated employees were over age forty. (Pls.' LR56.1 ¶ 14.) Lastly, Rocereto states that, while fifty-six percent of the NSF sales managers were over age forty, only twenty-three percent of these employees were protected from termination, while eighty-percent were terminated.[8] (Id.) On this basis, Rocereto alleges that the RIF had a disparate impact on the class of employees protected by the ADEA.

Rocereto fails to state a valid disparate impact claim. In order to establish a *prima facie* case using the disparate impact method, Rocereto must identify a facially neutral employment policy and present statistical evidence demonstrating that the policy had a disproportionately harsh impact on employees in the protected class. Rocereto's claim fails on both prongs. First, Rocereto does not identify a facially neutral employment policy. Indeed, Rocereto alleges that the policy reasons given by Hyatt for her termination are a pretext, and that her firing was the result of intentional discrimination. Second, Rocereto makes no effort to show the Court by any rigorous analysis that her statistics are either reliable or relevant to the issue at hand. It is within a district court's discretion to determine the validity and value of statistical evidence when offered through expert testimony. *Chavez v. Ill. State Police*, 251 F.3d 612, 641 (7th Cir. 2001). This discretion applies *a fortiori* when statistics are prepared by the parties themselves or their

---

[8] It is unclear how twenty-three percent of employees over the age of forty were protected from termination while eighty percent were terminated. The Court assumes that Rocereto means eighty percent of the ten fired employees were over forty. Rocereto's misstatement highlights one of the pitfalls of creating and playing with statistics.

attorneys. In this case, the Court finds that Rocereto's statistical evidence, as it has been presented to the Court, is simply insufficient to qualify as evidence of employment discrimination.

Rocereto has not shown that her statistical results were arrived at using a representative group of employees, nor that the apparent discrepancies are statistically significant. While Rocereto points to a discrepancy between the percentage of NSF members over forty years old (56%) and the percentage of the terminated employees in that group (80%), only ten employees were terminated altogether. Presumably, if six, and not eight, of the ten terminated employees had been over forty years old, Rocereto's statistical results would no longer be compelling. Because of the small sample size, it is difficult to give much weight to any discrepancy in the absence of expert testimony. Furthermore, the evidence suggests that many of the youngest employees factored into Rocereto's analysis held very different, and much less lucrative, positions than Rocereto.[9] Finally, as stated above in footnote 8, some of Rocereto's statistical claims appear to be mathematically impossible. Because Rocereto has not identified a facially neutral employment policy or presented competent statistical evidence of a disparate impact on older employees, she fails to state a claim using the disparate impact method.

---

[9] Evidence labeled "Pls.' Ex. 199" and "Pls.' Ex. Horne Testimony, R.149" suggests that several of the youngest employees identified by Rocereto worked at a call center in Omaha, Nebraska, where they had significantly fewer responsibilities than Rocereto and made less than half of her salary. (Def.'s Resp. Pls.' LR56.1 ¶¶ 14, 52.)

### b. Direct method of proof relying on circumstantial evidence

Rocereto next contends that summary judgment is inappropriate because she has circumstantial evidence of age discrimination based on a remark made by John Horne some months before the RIF[10] and on Hyatt's hiring of new NSF members in the year prior to the RIF. First, Rocereto testified that she was told by another Hyatt employee that Horne stated, in reference to the retirement of an older employee, that there were other "dinosaurs" in the NSF whom he would not mind seeing leave. (Pls.' LR56.1 ¶ 9.) Rocereto was neither present when this remark was made nor specifically mentioned by Horne but she felt that Horne was referring to her and other employees in her age group. (Rocereto Dep. II at 21-22.) According to Rocereto, "[w]hen considered in connection with . . . all the events that occurred shortly after Horne made this remark, it is unmistakable that Horne considered the sales managers he fired to be 'dinosaurs' due to their gender, age, and disability." (Pls.' Br. at 5.) Second, Rocereto suggests that, despite a hiring freeze, Hyatt hired ten new NSF members prior to the RIF and then retained those employees while firing ten, older long-time NSF members, including Rocereto.

A remark by an employment decision maker that suggests a propensity to evaluate employees based on prohibited criteria may be circumstantial proof of discriminatory animus. *Randle v. LaSalle Telecomm., Inc.*, 876 F.2d 563, 569-70 (7th Cir. 1989). Absent some evidence of a nexus between the remark and the challenged employment decision, however, such remarks on their own do not support an inference of discrimination sufficient to survive summary

---

[10] Hyatt's briefs suggest that the purported statement was uttered five months before the RIF; Plaintiffs' statement of facts is vague on the timing of the remark, claiming that it occurred "sometime prior" to the RIF. (Def.'s Reply Br. at 18; Pls.' Br. at 5.)

judgment. Thus, the remark must be "relatively contemporaneous to the termination of employment and must be related to the employment decision in question." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1116 (7th Cir. 1992) (internal quotations omitted).

Horne's statement was not made in Rocereto's presence and did not specifically reference Rocereto. The only connection between Rocereto and the remark is that, having heard about the remark from another employee, Rocereto felt that the remark referred to her and employees of a similar age. The single, isolated remark occurred several months before the decision to terminate Rocereto, at a time when, according to all of the evidence before the Court, the RIF in which Rocereto was terminated had not yet been contemplated. Therefore, this is not a case where remarks arguably betraying a discriminatory animus were directed at the plaintiff and were proximate to the adverse decision. *Compare to Hunt v. City of Markham*, 219 F.3d 649, 652-53 (7th Cir. 2000) (mayor's ageist and racist remarks directed at terminated police officers contemporaneously with termination created issue of fact for trial on issue of discrimination). Even if Horne's remark was an unambiguous reference to the age of certain employees, as opposed to outmoded businesses practices as Hyatt contends, Rocereto has failed to produce any evidence suggesting a nexus between the remarks and the decision to terminate her in the RIF.

Next, Rocereto claims that, despite a hiring freeze, Hyatt hired ten new NSF members prior to the RIF and then retained those employees while firing ten, older long-time NSF members, including Rocereto. Rocereto also claims that several younger members of the NSF were promoted prior to the Fall 2001 RIF. Despite these claims, Rocereto fails to present evidence of discrimination or preferential treatment of younger employees, as she offers no evidence that younger applicants for positions and promotions were selected instead of older

applicants. Significantly, Rocereto provides no information on the ages of the applicants for the positions and promotions, nor does she claim to have pursued any of these positions or promotions herself.

Citing *Cerutti v. BASF Corp.*, Rocereto argues that she can prevail on her discrimination claim if she constructs a "convincing mosaic" of circumstantial evidence that allows a jury to infer intentional discrimination by the decision maker. 349 F.3d 1055, 1060-61 (7th Cir. 2003). Rocereto's direct method argument relies on two pieces of evidence: (1) a "dinosaur" remark that lacks a nexus between the remark and the decision to terminate her and (2) new hires and promotions that lack both context and a nexus to the RIF. Consequently, Rocereto has not constructed a "mosaic" of circumstantial evidence, and her evidence is insufficient to allow a rational fact-finder to infer intentional age discrimination under the direct method of proof.

### c. The indirect burden-shifting approach

Rocereto also alleges that she can prove age discrimination by using the indirect, burden-shifting approach. As discussed above, under this approach Rocereto must first establish a *prima facie* case by showing that she suffered a detrimental employment decision and that a similarly situated employee not in the protected class of workers between forty and seventy years of age was treated more favorably. In order to be similarly situated, an employee must be comparable in "all material respects." *Sartor*, 388 F.3d at 279.

Rocereto's complaint and memorandum opposing summary judgment allege that a thirty-three-year-old coworker named Jennifer Roman was treated more favorably than Rocereto in Hyatt's RIF. However, undisputed material facts establish that Roman was not similarly

situated to Rocereto for the purposes of establishing a *prima facie* case under the indirect

burden-shifting approach. Roman had a greater diversity of accounts than Rocereto, whose

portfolio was primarily composed of insurance industry accounts. (Def.'s LR56.1 ¶ 42.) Next,

unlike Rocereto, Roman was geographically located close to many of her accounts. (Id.)

Because Roman, the younger employee, was not similarly situated to Rocereto, Rocereto cannot

rely on the fact that Roman was not terminated in the RIF to establish a *prima facie* case of age

discrimination.[11] The retained employee who most nearly meets the necessary criteria to be

considered "similarly situated" to Rocereto appears to be Marilyn Brumbaugh, as both Rocereto

and Brumbaugh specialized in insurance accounts. Marilyn Brumbaugh, however, was fifty-six

years old at the time of the RIF and therefore falls within the protected class of workers under the

ADEA. Thus, neither retained employee is a similarly situated employee not in the protected

class. Consequently, Rocereto cannot establish a *prima facie* case of age discrimination using

the indirect method of proof.

Even if Rocereto were able to establish a *prima facie* case of age discrimination, Hyatt

would still be entitled to summary judgment. Once a plaintiff has established a *prima facie* case

under the indirect burden-shifting approach, the defendant can rebut the presumption of

discrimination by providing a legitimate nondiscriminatory reason for its actions. As discussed

above, Hyatt claims that Rocereto was terminated because her insurance industry accounts were

---

[11] This same argument applies to Molly Crompton, an NSF employee referred to in
Plaintiffs' LR 56.1 filing as a similarly situated younger employee. (Pls.' LR56.1 ¶¶ 49-50.)
Though Crompton was younger than Rocereto, she held different types of accounts in different
cities. (Def.'s Resp. Pls.' LR56.1 ¶ 50.) Rocereto claims that she asked NSF management for
more accounts but there is no evidence that Rocereto sought Crompton's position or was
amenable to moving to new cities.

- 33 -

declining, could be handled by another manager specializing in insurance accounts, lacked growth potential, and were geographically distant from her. (Def.'s LR56.1 ¶¶ 38, 43.) Having proffered a nondiscriminatory explanation, Hyatt is entitled to summary judgment unless Rocereto can produce evidence that would allow a reasonable fact finder to conclude that Hyatt's explanation is a pretext intended to disguise underlying intentional discrimination.

Rocereto presents the same pretext argument discussed above in the context of Plaintiffs' gender discrimination claims but offers the "dinosaur" remark and the hiring and promotion of new NSF members as additional evidence of pretext. The Court has already determined that the "dinosaur" remark is too temporally distant from and tenuously related to Rocereto's termination to raise an inference of discrimination. For the same reasons, the Court concludes that the "dinosaur" remark, when combined with other previously rejected evidence of pretext, is insufficient to raise a question of fact on the issue of pretext. As for the hiring and promoting of NSF members, Hyatt maintains that: (1) the ten new hires replaced retiring NSF members (not in violation of the corporation's hiring freeze); (2) these hiring decisions were made before the RIF was contemplated and before the September 11, 2001 attacks; and (3) there is no evidence that younger applicants for positions or promotions were selected instead of older applicants because Plaintiffs provide no information on the ages of the pool of people considered for the jobs. (Def.'s Resp. Pls.' LR56.1 ¶ 5.) The Court agrees that, absent evidence of hiring freeze violations, a temporal nexus between the new hires and the contemplation of the RIF, or ages of the pool of job applicants, Rocereto does not present sufficient evidence of pretext to overcome Hyatt's nondiscriminatory explanations for terminating her on the basis of the strength of her account portfolio.

Rocereto's arguments do not state a claim for discrimination using the disparate impact theory. Rocereto has not produced circumstantial evidence of discriminatory animus which would permit a reasonable fact finder to conclude that her termination was the result of intentional discrimination, nor has she established a *prima facie* case of age discrimination using the indirect burden-shifting approach. Furthermore, even if Rocereto had established a *prima facie* case, she has not produced any evidence to suggest that Hyatt's nondiscriminatory explanation for terminating her was a pretext. For all of these reasons, Hyatt is entitled to summary judgment on Rocereto's age discrimination claim.

### 3.    Plaintiff Aylward's Americans With Disabilities Act Claims

Aylward alleges disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112 *et seq.* (hereinafter "ADA"). The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In addition, the ADA provides that "an employer discriminates against a qualified individual with a disability by 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 563 (7th Cir. 2000) (*quoting* 42 U.S.C. § 12112(b)(5)(A)).

Under the ADA, a plaintiff may demonstrate discrimination by showing a failure to accommodate or by presenting evidence of disparate treatment. *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997). In a failure to accommodate case a plaintiff must

- 35 -

show that: (1) she was disabled; (2) her employer was aware of her disability; (3) she was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position; and (4) her employer failed to reasonably accommodate her disability. *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001); *McPhaul*, 226 F.3d at 563. In a disparate treatment case the plaintiff may present direct evidence of discrimination or utilize the indirect burden-shifting approach discussed in the ADEA and Title VII contexts above. In order to establish a *prima facie* case of discrimination under the indirect burden-shifting approach the plaintiff must show that: (1) she was disabled; (2) she was qualified to perform the essential functions of her job with or without accommodations; (3) she suffered an adverse employment decision because of the disability; and (4) a similarly situated employee who was not disabled was treated more favorably. *Buie*, 366 F.3d at 503. Once a *prima facie* case is established, the defendant has the burden of providing a nondiscriminatory explanation for its actions. If the defendant does so, the burden shifts back to the plaintiff to present evidence that the defendant's reason is pretextual. *Id.*

Although it is undisputed that Aylward suffers from MS, Hyatt argues that there is no evidence that Aylward is disabled within the meaning of the ADA. Specifically, Hyatt states that Aylward is still capable of performing her job and has not established that MS causes a substantial impairment of one of her major life activities.

To be disabled under the ADA, the Court must find: (1) Aylward has an impairment; (2) a life activity that Aylward claims has been substantially limited constitutes a major life activity under the ADA; and (3) the impairment substantially limits one of Aylward's major life activities. *See Bragdon v. Abbott*, 524 U.S. 624, 631-32 (1998). According to the EEOC's implementing

regulations, major life activities are those functions "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). An impairment is substantially limiting when the individual is either (1) unable to perform a major life activity that the average person in the general population can perform, or (2) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity, as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity. 29 C.F.R. § 1630.2(j)(1).

The ADA lists MS as an impairment so the Court focuses on whether the life activities that Aylward claims have been substantially limited by her MS are deemed major life activities by the ADA and, if so, whether those major life activities are indeed substantially limited. Aylward claims that MS causes her extreme fatigue, and affects her ability to care for herself, learn, and work. Aylward has submitted evidence, including testimony from her physician, that her MS: (1) impairs her short-term memory, cognitive function, and ability to handle stress; (2) reduces her stamina; and (3) causes other physical symptoms such as incontinence. (Pls.' LR56.1 ¶ 25.) Additionally, Hyatt has granted Aylward certain accommodations that are consistent with these limitations, such as napping during the day, returning calls at the end of the day, working from home and setting her own schedule. While this evidence may not establish that Aylward is disabled as a matter of law, there is an evidentiary basis from which a reasonable fact-finder could conclude that Aylward's MS has caused a substantial impairment of a major life activity, making Aylward disabled for the purposes of the ADA. Accordingly, viewing all the

evidence in a light most favorable to Aylward, the Court assumes that Aylward is disabled and is protected from discrimination under the ADA.

### a.    Failure to accommodate under ADA

Aylward alleges that Hyatt discriminated against her by failing to reasonably accommodate her disability. Aylward's failure to accommodate claim fails because, even if she can establish the first three elements, all the evidence suggests that Hyatt granted her requests for specific accommodations for her MS. Specifically, Hyatt accommodated Aylward by allowing her to work from home, take naps, and return all of her calls at the end of the day, rather than answer them continuously throughout the day. (Pls.' LR56.1 ¶ 27.) Aylward herself testified that, while her supervisor made recommendations for improving her performance, not one of Aylward's accommodations was removed by Hyatt. (Def.'s LR56.1 ¶ 28.) Although Aylward maintains that her supervisor's recommendations were a prelude to the removal or denial of accommodations, the ADA does not provide a cause of action based on an anticipated but unrealized adverse employment action. It follows that Aylward is unable to establish a *prima facie* case necessary for her failure to accommodate claim.

### b.    Disparate treatment under ADA

Aylward's second claim under the ADA alleges disparate treatment. In order to avoid summary judgment, she must present some evidence, direct or circumstantial, that Hyatt terminated her because she had MS. In opposing summary judgment, Aylward relies on two pieces of circumstantial evidence. First, Aylward contends that criticisms contained in her

March 2001 performance review create an inference of discriminatory animus. Next, Aylward contends that her supervisor's refusal to amend the performance review to explicitly note that she suffered from MS creates an inference of discrimination against her.

Aylward's evidence fails to create an inference that she was terminated because of her disability. Aylward argues that demonstrably unjustified criticisms or unattainably high goals set for an employee can show that a supervising employee was biased against an employee. Assuming that this is true, the instant case does not present such a situation. Aylward herself has testified that the criticisms in her March 2001 performance review were reasonable and fair in relation to her job performance. (Def.'s LR56.1 ¶¶ 22-23; Pls.' LR56.1 ¶ 30.) When the Plaintiff herself recognizes her employer's criticisms as legitimate, it is hard to see how those criticisms create an inference of unlawful discrimination. Aylward argues that her supervisor set unattainably high goals for her when she recommended that Aylward increase her travel and entertaining and enroll in a computer class. The Court finds these recommendations to be vague, open-ended, and intended merely to push Aylward to improve the value of her accounts. As Aylward acknowledges the validity of her supervisor's criticisms, acknowledges that she had the lowest performing group of accounts of any member of the NSF, and acknowledges that she was a full time NSF employee, a recommendation to increase travel, entertaining, and computer skills does not equate to a biased employer setting unreasonable and unattainably high goals.

Similarly, Hyatt's reluctance to include a reference to Aylward's MS in her performance review does not provide a factual basis from which to infer discrimination. Neither the ADA nor Seventh Circuit case law requires an employer to make an explicit reference to an employee's disability in a performance review. Furthermore, given Hyatt's history of accommodating

Aylward's special needs, it is not evident that the refusal to make explicit reference to Aylward's MS creates any inference of discrimination. Rather, the evidence suggests that Hyatt was flexible in accommodating Aylward's needs and that Hyatt's criticisms were reasonable. Aylward's performance rating was "meets expectations," indicating that Hyatt acknowledged her performance to be satisfactory. Therefore, standing on its own, Hyatt's refusal to specifically reference Aylward's MS is not evidence that would permit a reasonable fact-finder to infer discriminatory animus against Aylward.

Aylward fails to provide evidence that establishes a *prima facie* case of failure to accommodate and does not produce sufficient circumstantial evidence of discriminatory animus to create a genuine issue of material fact as to her disparate treatment claim. Consequently, Hyatt is entitled to summary judgment on Aylward's ADA claims.

### c.  Aylward's retaliation claim

Plaintiffs' complaint includes a claim of retaliation against Hyatt, asserting that Hyatt terminated Aylward in retaliation for her attempts to assert her right to be free from discrimination based on her alleged disability, in violation of the ADA, 42 U.S.C. § 12203(a). While refusing to concede that the retaliation claim was waived, Aylward, both in her memorandum opposing summary judgment and in open court on June 16, 2005, declined to oppose Hyatt's motion with respect to the claim of retaliation.

In order to prevail on a retaliation claim under the ADA, Aylward must show that she engaged in a statutorily protected activity, such as alleging discrimination against a superior, and that she was terminated because of this activity. *See Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d

499, 511 (7th Cir. 1998). Aylward produces no evidence that she was terminated because she engaged in a statutorily protected activity. Aylward's memorandum opposing summary judgment suggests that her request to have her MS specifically referenced in her performance review is a protected activity. As discussed above, the Court finds no merit in the argument that a disabled person under the ADA has a right to have her disability referenced in a performance review. Furthermore, even if her March 2001 request was a protected activity, there is no evidence of any nexus between the request and her termination. Consequently, there is no issue of fact for trial on Aylward's retaliation claim. Because there is no issue of material fact, Hyatt is entitled to summary judgment with respect to Aylward's retaliation claim.

### III. Conclusion

For the reasons set forth above, Plaintiffs' motion to strike is granted in part and denied in part, and Hyatt's motion for summary judgment is granted with respect to all of Rocereto's claims and all of Aylward's claims.

ENTER ORDER:

_____

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: August 5, 2005.

- 41 -

Copies have been mailed to:

L. STEVEN PLATT, Esq.
Arnold and Kadjan
19 West Jackson Boulevard
Chicago, IL 60604

ROBERT A. STEINBERG, Esq.
Waite, Schneider, Bayless & Chesley
  Co., L.P.A.
1513 Fourth and Vine Tower
Cincinnati, OH 45202


Attorney for Plaintiffs

THERESA M. GALLION, Esq.
Fisher & Phillips, L.L.P.
2525 Sun Trust Financial Centre
401 East Jackson Street
Tampa, FL 33602

JANE M. McFETRIDGE, Esq.
JOEL W. RICE, Esq.
Fisher & Phillips, L.L.P.
1000 Marquette Building
140 South Dearborn Street
Chicago, IL 60603

Attorneys for Defendant